UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>CALVIN GILLETTE,<br><br>Defendant. | 3:17-CR-30122-RAL<br><br><br>OPINION AND ORDER ADOPTING<br>REPORT AND RECOMMENDATION |
|---|---|

I.  **Facts Relevant to Motion to Suppress**

On January 31, 2017, Daniel Reynolds, a police officer for the Rosebud Sioux Tribe, responded to a domestic dispute call at a house in Rosebud, South Dakota. T. 9–10. Upon entering the house, Officer Reynolds located Calvin Gillette and Lucille Running Enemy, the alleged victim, in a back bedroom. T. 11; Ex. 1 at 00:45–01:00. Officer Reynolds handcuffed Gillette, took him out to the living room to sit on a couch, and went back down the hall to speak with Running Enemy. Ex. 1 at 01:00–04:10. Gillette interjected several times while Running Enemy spoke to Officer Reynolds, saying "I'm sorry" and that he "didn't know what happened." Ex. 1 at 02:26–04:15. Officer Reynolds eventually turned his attention to Gillette, who by that time had left the couch, walked closer to where Officer Reynolds and Running Enemy were standing, and addressed Officer Reynolds directly. Ex. 1 at 02:26–04:15. The following exchange took place:

> Officer Reynolds: Okay, what, what happened, Calvin?

1

>           Gillette: I didn't know what happened last night. I don't
> remember coming home.
>           Officer Reynolds: Were, were you drinking, or what?
>           Gillette: Yeah, yeah yesterday was my homeboy's
> memorial.
>           Officer Reynolds: Okay.
>           Gillette: And uh, that—and I asked her, did I mizz out?
> And she was like yeah, and I felt bad enough for that and I was like
> okay, you want me to go, I'll go.
>           Officer Reynolds: Mmm hmm.
>           Gillette: And it just took off from there. You know, we
> started arguing after that, and I just–

04:05–04:45. This discussion, which Judge Moreno referred to as the "initial statements," ended when Running Enemy interrupted Gillette midsentence. Ex. 1 at 04:40. Running Enemy and Gillette then argued about what occurred until Officer Reynolds cut the parties off and told Running Enemy to get her sister, Amanda Roubideaux, from one of the back rooms in the house. Ex. 1 at 04:40–06:10. Roubideaux spoke briefly with Officer Reynolds in the hall, but Gillette kept interrupting her. Ex. 1 at 06:30–07:30. Officer Reynolds then went over with Gillette to the couch in the living room, finished packing Gillette's bag, and prepared him to leave. Ex. 1 at 7:30–10:45. While doing so, Officer Reynolds and Gillette conversed about Gillette's belongings and the fact that he was being arrested for domestic abuse. Ex. 1 at 07:30–10:45. Gillette asked to speak to Running Enemy during this conversation but Officer Reynolds refused to let him. Ex. 1 at 08:55–09:05. Once outside the home, Gillette took off running. Ex. 1 at 10:42; T. 16. Officer Reynolds eventually found Gillette in the basement of a nearby house and took him to the tribal jail. Ex. 1; T. 17.

The Rosebud Sioux Tribe charged Gillette with multiple crimes, including domestic abuse of Running Enemy. Ex. 2. In May 2017, Gillette appeared with counsel in tribal court and pleaded guilty to the domestic assault and several other charges. Exs. 3, 4. Four months later, a federal grand jury indicted Gillette for domestic assault by a habitual offender. Doc. 1. This

federal charge arose from the same incident with Running Enemy that Gillette had pleaded guilty to in tribal court. Gillette filed two motions to suppress, the first arguing that his statements are inadmissible under Miranda v. Arizona, 384 U.S. 436 (1966), Doc. 31, and the second arguing that his tribal court guilty plea is inadmissible under the Fifth and Sixth Amendments, Doc. 33. Magistrate Judge Mark A. Moreno held a hearing on these motions at which he heard testimony from Officer Reynolds and received into evidence a video recording from the body camera Officer Reynolds was wearing during his encounter with Gillette, a transcript of the audio from this video, an audio recording of Gillette's tribal court guilty plea, and the complaint and judgment from the tribal court case. Judge Moreno recommended granting Gillette's motion to suppress his statements in part, concluding that while Gillette's initial statements were voluntary, they were the result of custodial interrogation and therefore inadmissible under Miranda in the government's case in chief. Doc. 44. However, Judge Moreno concluded that Gillette's "later statements"—meaning those he made while arguing with Running Enemy until he was apprehended outside the house—were admissible because they were not made in response to interrogation. As to the tribal court guilty plea, Judge Moreno recommended denying Gillette's motion to suppress, finding that neither the Fifth nor Sixth Amendments prohibited the government from offering the plea at trial. Doc. 44. Gillette has now objected to the report and recommendation. Doc. 45.

This Court reviews a report and recommendation under the statutory standards found in 28 U.S.C. § 636(b)(1), which provides in relevant part that "[a] judge of the [district] court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). Having conducted a de novo review, this Court adopts the report and recommendation in full.

II. Discussion

A. <u>Miranda</u> Challenge

Under <u>Miranda</u>, the police must give a suspect who is in custody certain warnings before subjecting him to interrogation. 384 U.S. at 444. The government does not dispute that Gillette was in custody once he was handcuffed, T. 21, 24, so the only question is whether Officer Reynolds interrogated Gillette. "Interrogation" for <u>Miranda</u> purposes obviously includes "express questioning" by a police officer. <u>Rhode Island v. Innis</u>, 446 U.S. 291, 300–01 (1980). But it also includes the "functional equivalent" of express questioning—"any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." <u>Id.</u> at 301 (footnote omitted). <u>Miranda</u> does not apply, however, to "spontaneous statements made during a conversation not initiated by the officer." <u>United States v. Chipps</u>, 410 F.3d 438, 445 (8th Cir. 2005). And an officer's attempt to clarify a spontaneous statement "generally does not constitute interrogation." <u>Id.</u> Such an attempt can constitute interrogation, however, if the question "enhance[s] the defendant's guilt or raise[s] the offense to a higher degree." <u>Butzin v. Wood</u>, 886 F.2d 1016, 1018 (8th Cir. 1989) (citation omitted).

Judge Moreno concluded that Gillette's initial statements violated <u>Miranda</u> but were voluntary. This Court agrees that Gillette's initial statements were voluntary and, in any event, Gillette has not objected to this conclusion. As for Gillette's later statements, Judge Moreno concluded these statements were admissible because they were either spontaneous or in response to innocuous attempts by Officer Reynolds to clarify or confirm what Gillette had already said. Doc. 44 at 7. Gillette does not object to this finding by arguing that his statements were not spontaneous or that a particular question by Officer Reynolds constituted interrogation. Doc. 45

4

at 2. Instead, Gillette contends that Officer Reynolds created a situation that was reasonably likely to elicit incriminating statements when he allowed Gillette to speak with Running Enemy after asking him what happened and whether he had been drinking. Doc. 45 at 2. But the body cam video reveals that Officer Reynolds's actions were not the functional equivalent of express questioning.

There is no evidence that Officer Reynolds intended to elicit an incriminating response by asking Gillette a few questions within earshot of Running Enemy and then allowing the two to briefly argue. Indeed, Officer Reynolds began his investigation by removing Gillette to the living room couch so that he could speak with Running Enemy separately. Ex. 1; T. 12. It was not until Gillette had interrupted several times, left the couch to walk closer to where Officer Reynolds and Running Enemy were talking, and addressed Officer Reynolds directly that Officer Reynolds turned to Gillette and asked what happened. Ex. 1. The ensuing argument between Running Enemy and Gillette, which lasted less than ninety seconds, ended when Officer Reynolds directed Gillette to calm down and Running Enemy to get her sister. Ex. 1. The only thing Officer Reynolds said during the argument was a single "mmm." Ex. 1. Nothing about Officer Reynolds's behavior could have suggested to Gillette that Officer Reynolds was attempting to elicit incriminating statements from him while he argued with Running Enemy. Put another way, Officer Reynolds's actions could not have created the sort of coercive pressure necessary to find the functional equivalent of interrogation when Officer Reynolds did not question Gillette until after he had involved himself in the conversation with Running Enemy, did not arrange the argument between Running Enemy and Gillette, and did not do anything to encourage Gillette to respond to Running Enemy once the argument started. Ex. 1. Moreover, when Gillette asked to speak with Running Enemy again a few minutes later, Officer Reynolds

refused. Ex. 1. Had Officer Reynolds meant to initiate an incriminating conversation between Gillette and Running Enemy, he would not have ended the argument and then denied Gillette's request to speak with Running Enemy further. In sum, Gillette's later statements were not the result of interrogation. See Arizona v. Mauro, 481 U.S. 520, 527–29 (1987) (holding that officers did not interrogate suspect by allowing him to speak with his wife in the presence of an officer where there was no evidence that officers were attempting to elicit incriminating statements and the suspect could not have felt coerced into incriminating himself); United States v. Vazquez, 857 F.2d 857, 863 (1st Cir. 1988) (holding that bringing together two suspects who had given the police conflicting statements did not constitute interrogation where nothing suggested the agents were trying to get the suspects to incriminate themselves).

Although a finding that the later statements were not the result of interrogation would normally end this Court's inquiry, Gillette also argues that the later statements should be suppressed because they were "tainted by and flowed from" Officer Reynolds's Miranda breach. Doc. 45 at 2. The question thus becomes whether the later statements, which were made without Miranda warnings but not in response to interrogation, are admissible even though they followed a previous statement that was voluntary but violated Miranda.

Although the Supreme Court has not addressed this question, it has held that a confession made after proper Miranda warnings need not be suppressed simply because it followed an earlier admission that was voluntary but unwarned. Oregon v. Elstad, 470 U.S. 298, 307–14 (1985). In reaching this conclusion, the Supreme Court rejected application of the "fruit of the poisonous tree" doctrine to determine whether the Mirandized confession was admissible. Id. at 309. Instead, the Court explained, the admissibility of a Mirandized confession that follows a voluntary but unwarned statement turns "on whether [the confession] is knowingly and

6

voluntarily made." Id. "As in any such inquiry, the finder of fact must examine the surrounding circumstances and the entire course of police conduct . . . in evaluating the voluntariness of [the defendant's] statements." Id. at 318.

Three federal circuit courts have applied the principles of Elstad in cases where the defendant makes two voluntary but unwarned admissions, the first of which violated Miranda and the second of which did not because it was not in response to interrogation. United States v. Pettigrew, 468 F.3d 626 (10th Cir. 2006); United States v. Abdulla, 294 F.3d 830, 834 (7th Cir. 2002) (assuming that the first statement violated Miranda); Medeiros v. Shimoda, 889 F.2d 819 (9th Cir. 1989). These courts all held that admission of the second statement turns on whether it was made voluntarily. Pettigrew, 468 F.3d at 636; Abdulla, 294 F.3d at 836; Medeiros, 889 F.2d at 823–24.

The evidence here shows that Gillette's later statements were voluntary. Other than handcuffing Gillette, Officer Reynolds did not engage in any coercive conduct. He used a conversational tone and remained calm even when Gillette and Running Enemy became agitated. This was not a situation where Gillette would have felt compelled to talk because he let "the cat out of the bag" with his initial statements. Gillette merely admitted to having drank and then argued with Running Enemy. Ex. 1. When Running Enemy accused Gillette of assaulting her, he denied it. Ex. 1. Because Gillette's later statements were ones he freely made, they are admissible at trial.

B.      **Tribal Court Guilty Plea**

Gillette concedes that his initial argument that the Sixth Amendment bars admission of his tribal court guilty plea fails based on the case law cited in the report and recommendation and the fact that he was represented by licensed counsel when he entered his guilty plea. Doc. 45 at

7

2. He continues to argue, however, that his guilty plea violated the Fifth Amendment's Due Process Clause. A guilty plea must be knowing, voluntary, and intelligent to satisfy due process. McCarthy v. United States, 394 U.S. 459, 466 (1969). Gillette contends that his guilty plea did not meet this standard because he never provided a factual basis for his plea, the complaint was not read in open court, and the tribal judge did not advise him that he was presumed innocent and that the prosecution had to prove him guilty beyond a reasonable doubt. Doc. 33 at 2; Doc. 45 at 3.

Gillette's reliance on the Fifth Amendment's Due Process Clause is misplaced. Because Indian tribes are separate sovereigns that existed long before the Constitution, Santa Clara Pueblo v. Martinez, 436 U.S. 49, 56 (1978), the Bill of Rights, including the Fifth Amendment, "does not apply in tribal court proceedings," United States v. Bryant, 136 S. Ct. 1954, 1962 (2016). By passing the Indian Civil Rights Act (ICRA), however, Congress granted "a range of procedural safeguards to tribal-court defendants 'similar, but not identical, to those contained in the Bill of Rights and the Fourteenth Amendment.'" Bryant, 136 S. Ct. at 1962 (quoting Martinez, 436 U.S. at 57). Among other safeguards, ICRA guarantees tribal-court defendants the right against compelled self-incrimination, the right to "be informed of the nature and cause of the accusation," the right to confront witnesses and to compulsory process, the right to a jury of at least six persons in criminal cases punishable by imprisonment, and the right to an attorney.[1] 25 U.S.C. § 1302(a)(4), (6), (10). Most importantly here, ICRA requires tribes to ensure "due process of law." 25 U.S.C. § 1302(a)(8). The Supreme Court has held that the safeguards of ICRA are sufficient to ensure that tribal court convictions are reliable. Bryant, 136 S. Ct. at

---

[1]Under ICRA, tribes are only required to provide counsel for indigent defendants when a sentence of more than one year is imposed. 25 U.S.C. § 1302(c)(2). In all other circumstances, defendants may hire an attorney to represent them but must do so at their own expense. 25 U.S.C. § 1302(a)(6).

8

1966. Thus, a tribal court conviction obtained in compliance with ICRA may be used in federal court without violating the defendant's right to due process. Id.

Here, Judge Moreno found that Gillette's guilty plea complied with ICRA and tribal law. Although Gillette has not objected to this conclusion, this Court has reviewed his guilty plea and agrees that the plea proceedings complied with ICRA. Gillette confirmed that he understood the tribal criminal complaint and that his guilty plea was voluntary. Ex. 1 at 27:10–27:15, 28:55–29:08. At the beginning of the hearing, Gillette's lawyer named all of the charges to which Gillette was pleading guilty. Ex. 4 at 23:45–24:30. The tribal judge then listed the crimes Gillette was pleading guilty to and the maximum penalties. Ex. 4 at 24:33–25:35. Later in the hearing, the tribal judge asked Gillette if he understood the complaints against him, and Gillette affirmed that he did. Ex. 4 at 27:10–15. After that, the tribal judge listed each charge, along with the corresponding docket number, and asked Gillette what his plea was to those charges. Ex. 4 at 27:22–28:08. Gillette thus was aware of the charge, the maximum penalty, and the consequences of his guilty plea. The tribal judge also told Gillette that by pleading guilty, he would be giving up his rights to a jury trial, to confront and cross-examine witnesses, to call witnesses on his behalf, the right to testify, and the right to appeal. Ex. 4 at 28:00–55. Gillette's attorney confirmed that Gillette understood the consequences of his guilty plea. Ex. 4 at 29:05–15. Because Gillette's guilty plea complied with ICRA, admission of the plea in federal court would not violate Gillette's right to due process.

Even if the Bill of Rights applied to tribal court proceedings, the alleged deficiencies about which Gillette complains might violate parts of Rule 11 of the Federal Rules of Criminal

Procedure but do not appear to violate the Fifth Amendment's Due Process Clause.[2] Absent special circumstances not present here, the Fifth Amendment's Due Process Clause does not require judges to place a factual basis for guilty pleas on the record. Loftis v. Almager, 704 F.3d 645, 648 (9th Cir. 2012) ("Among the requirements imposed on trial judges by rule—but not the Constitution—is the finding of a factual basis."); Meyers v. Gillis, 93 F.3d 1147, 1151 (3d Cir. 1996) ("Put simply, the Due Process Clause of the Fourteenth Amendment to the United States Constitution does not require an on-the-record development of the factual basis supporting a guilty plea before the entry of the plea . . . ."); see also United States v. Johnson, 703 F.3d 464, 469 n.4 (8th Cir. 2013) (applying a Fourteenth Amendment case to a Fifth Amendment claim and explaining that the phrase "due process of law" has the same meaning in both amendments). Moreover, Gillette has not cited any cases holding that the Due Process clause requires judges to inform defendants about the presumption of innocence and the prosecution's burden of proving guilt beyond a reasonable doubt. The cases this Court has found suggests that no such requirement exists as part of the Due Process Clause. See United States v. Nelson, 951 F.2d 364

---

[2] It is an open question whether the due process guarantee in ICRA should be interpreted the same way as the Due Process Clause in the Fifth Amendment. See Conference of Western Attorneys General, American Indian Law Deskbook § 7:5 (2017 ed.) ("[E]ven where the general analogue of a constitutional right has been included within ICRA, its scope may not be identical to the Bill of Rights counterpart."); William C. Canby, Jr., American Indian Law 414 (6th ed. 2014) ("It is . . . not safe to assume that, in the limited circumstances in which federal courts now apply [ICRA], the guarantees of [ICRA] will be enforced in exactly the same way as their counterparts in the Constitution. On the other hand, federal courts are most familiar with due process and equal protection law generated in a non-Indian context, and there is likely to be some tendency to apply that law to the tribes without modification."); see also Kelsey v. Pope, 809 F.3d 849, 864–66 (6th Cir. 2016) (applying federal due process cases to a claim that tribe violated ICRA's due process clause where the Indian tribe's criminal procedures did not differ significantly from those employed in Anglo-Saxon society); United States v. Schmidt, 403 F.3d 1009, 1013 (8th Cir. 2005) ("Although the fourth amendment does not apply to the conduct of Indian tribal officials in Indian territory, the same standards are applicable to their actions under the Indian Civil Rights Act of 1968."). This question need not be resolved here because ICRA clearly does not incorporate the Federal Rules of Criminal Procedure into tribal criminal law.

(9th Cir. 1991) (unpublished) (stating that Supreme Court precedent did not require that the presumption of innocence be explained to the defendant before he pleads guilty); Brown v. Warden, Great Meadow Corr. Facility, 682 F.2d 348, 354 (2d Cir. 1982) (holding that constitution does not require judges to inform defendants that the prosecution must satisfy the beyond-a-reasonable-doubt standard of proof); Page v. Lafler, No. 05-74917, 2008 WL 474076, at *10 (E.D. Mich. Feb. 19, 2008) ("When a defendant waives his right to trial and accepts a guilty plea there is no constitutional requirement that he be informed of his right to be presumed innocent . . . ."); State v. Faggard, 184 So. 3d 837, 846 (La. Ct. App. 2016) (explaining that Supreme Court precedent "does not require that a defendant be informed that the State's burden of proof is beyond a reasonable doubt"); People v. Johnson, 876 N.Y.S.2d 282, 284 (N.Y. App. Div. 2009) ("A plea is not invalid solely because the court failed to specifically enumerate all the rights to which the defendant was entitled, including the right to have his or her guilt proven beyond a reasonable doubt at trial.") (internal citations, alterations, and marks omitted).

Finally, Gillette initially argued for suppression of his tribal-court guilty plea because the tribal judge did not read the charge to Gillette at the hearing, Doc. 33 at 2, although Gillette did not include this argument expressly in his objection to the report and recommendation, Doc. 45 at 3. "It is well established that a plea of guilty cannot be voluntary in the sense that it constitutes an intelligent admission that the accused committed the offense unless the accused has received 'real notice of the true nature of the charge against him, the first and most universally recognized requirement of due process.'" Marshall v. Lonberger, 459 U.S. 422, 436 (1983) (quoting Smith v. O'Grady, 312 U.S. 329, 334 (1941)). But the Due Process Clause does not require that "the judge must himself explain the elements of each charge to the defendant on the record." Bradshaw v. Stumpf, 545 U.S. 175, 183 (2005). Instead, the critical question is

11

whether the defendant was actually aware of the nature of the charge. Id.; Henderson v. Morgan, 426 U.S. 637, 647 (1976). In Henderson, the Supreme Court made the following observation about change of plea proceedings:

> Normally the record contains either an explanation of the charge by the trial judge, or at least a representation by defense counsel that the nature of the offense has been explained to the accused. Moreover, even without such an express representation, it may be appropriate to presume that in most cases defense counsel routinely explain the nature of the offense in sufficient detail to give the accused notice of what he is being asked to admit.

Henderson, 426 U.S. at 647. In Marshall, the Supreme Court applied the Henderson presumption to a guilty plea for attempted murder. Marshall, 459 U.S. at 437. Although the trial judge did not read the indictment aloud or explain the elements of the offense to the defendant, the judge did tell the defendant that he was pleading guilty to an "attempt on [the victim] with a knife." Id. at 427. The Supreme Court held that the defendant received adequate notice of the nature of the charge based on his intelligence and experience in the criminal justice system, the trial judge's statements, and the presumption that his attorney had informed him of the charge in the indictment. Id. at 436–38. For similar reasons, this Court finds that Gillette received adequate notice of the domestic abuse charge. Gillette has not offered any evidence that he did not understand the domestic abuse charge and nothing in the record suggests that this was so. After all, the indictment in this case alleges that Gillette had two prior convictions for domestic abuse in Rosebud tribal court, one in 2015 and the other in 2016. It is reasonable to presume that Gillette, having recently been convicted of domestic abuse on two occasions and represented by a licensed attorney, understood the nature of the crime of domestic abuse when he pleaded guilty in tribal court in May 2017. Marshall, 459 U.S. at 436–37. Moreover, Gillette's lawyer at the beginning of the hearing named all the charges to which Gillette was pleading guilty, after which the tribal judge listed the crimes and explained the maximum penalties. Gillette affirmed to the

tribal judge that he understood the charges against him. Gillette received "real notice of the true nature of the charge," and his plea was "voluntary in the sense that it constitute[d] an intelligent admission that [he] committed the offense," Marshall, 459 U.S. at 436, even though the change of plea hearing was not as formal as what occurs in federal courts under Rule 11 of the Federal Rules of Criminal Procedure.

### III. Conclusion

For the reasons stated above, it is hereby

ORDERED that Defendant's Objections to Report and Recommendations, Doc. 45, are denied. It is further

ORDERED that the Report and Recommendation on Motions to Suppress Statements and Tribal Court Guilty Plea, Doc. 44, is adopted. It is further

ORDERED that the Defendant's Motion to Suppress Statements, Doc. 31, is granted in part and denied in part as set forth in the Report and Recommendation. It is further

ORDERED that the Defendant's Motion to Suppress Tribal Court Guilty Plea, Doc. 33, is denied.

DATED this 23rd day of March, 2018.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE